**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**TERRE HAUTE DIVISION**

| | |
|---|---|
| OSCAR ROSALES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 2:14-cv-00061-JMS-WGH |
| | ) |
| CORIZON, ALFRED TALENS, | ) |
| JACQUES LECLERC, LOLIT JOSEPH, | ) |
| GRAY Ms., RN, | ) |
| | ) |
| Defendants. | ) |

**Entry Discussing Motion for Summary Judgment and Directing Entry of Final Judgment**

Plaintiff Oscar Rosales that the individual defendants Alfred Talens, Jacques LeClerc, Lolit Joseph and Nurse Gray were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment as applied to the States through the Fourteenth Amendment.[1] See dkts. 37 and 40. Specifically, Mr. Rosales alleges that Dr. Talens stopped Mr. Rosales' knee replacement surgery because the surgery was too expensive. Dr. LeClerc allegedly denied Mr. Rosales knee surgery and took his wheelchair and provided only a walker which made it difficult for Mr. Rosales to walk. Dr. Jospeh allegedly failed to provide Mr. Rosales with needed medical care for his knee.

---

[1] The plaintiff is now proceeding *pro se,* but at the time the amended complaint was filed he was represented by counsel. See dkts. 52 (reflecting counsels effort to obtain an expert witness to support claims); and dkt. 59 (sealed exhibit referencing difficulty obtaining expert witness to support claims). On June 19, 2015, the plaintiff filed a motion for counsel. On June 25, 2015, this motion was granted to the extent that the Court agreed to stay deadlines in this action for 30 days while the Court attempted to recruit counsel to assist the plaintiff. That same day the Court reached out to more than 80 attorneys on the Southern District of Indiana's Civil Trial Assistance Panel (see Local Rule 4-6) asking them to accept an appointment to represent Mr. Rosales. No attorneys were willing to accept this appointment and volunteer their time to represent Mr. Rosales in this action.

1

Finally, Nurse Gray allegedly failed to provide Mr. Rosales with knee surgery, took away his wheelchair, and failed to train Mr. Rosales on how to properly use the walker.[2] The claim against Corizon, Inc. ("Corizon") is that it intentionally interfered with Mr. Rosales receiving medical care once prescribed, and failed to provide Mr. Rosales appropriate and needed medical care (including surgery) needed on his left knee by and through the actions of its agent physicians and healthcare providers. The plaintiff seeks money damages and costs.

The defendants seek resolution of this action through summary judgment. They argue that the record demonstrates that they were not deliberately indifferent to Mr. Rosales' serious medical needs and that they took appropriate actions by performing multiple physical examinations, ordering diagnostic testing, providing physical therapy and pain medications, and referring Mr. Rosales to an outside specialist who determined that Mr. Rosales did not need surgery at that time. For the reasons explained below, the defendants' motion for summary judgment [dkt. 84] is **granted.**

# I.
# Summary Judgment Standard

A motion for summary judgment asks that the Court find that a trial based on the uncontroverted and admissible evidence is unnecessary because, as a matter of law, it would conclude in the moving party's favor. *See* Fed. R. Civ. Pro. 56. "As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive

---

[2] The first and second amended complaints purport to incorporate the original complaint, but this is not possible. See dkts. 40 and Local Rule 15-1 states that "[a]mendments to a pleading must reproduce the entire pleading as amended."

2

determination of every action." *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1103 (7th Cir. 2008) (citations omitted).

To survive a motion for summary judgment, the non-moving party must set forth specific, admissible evidence showing that there is a material issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). The key inquiry is whether admissible evidence exists to support a plaintiff's claims, not the weight or credibility of that evidence, both of which are assessments reserved to the trier of fact. *See Schacht v. Wis. Dep't of Corrections,* 175 F.3d 497, 504 (7th Cir. 1999). When evaluating this inquiry, the Court must give the non-moving party the benefit of all reasonable inferences from the evidence submitted and resolve "any doubt as to the existence of a genuine issue for trial ... against the moving party." *Celotex,* 477 U.S. at 330.

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. Pro. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially the grant of summary judgment. Fed. R. Civ. Pro. 56(e). "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir. 1996), *cert. denied*, 519 U.S. 1115 (1997).

## II.
## Undisputed Facts

Applying the standards set forth above, the undisputed material facts are as follows:

**Dr. Talens** became a treating physician at Wabash Valley on February 1, 2006. He retired in late May of 2011. Dr. Talens first saw Mr. Rosales on July 30, 2009, in response to his complaints of left knee pain. Dr. Talens physically examined Mr. Rosales' left knee and noted some swelling. However, his pulses were normal and Dr. Talens ordered x-rays of both knees and a warm compress. X-ray results were negative for the right knee and reflected chronic but stable changes to the left knee. Based on the x-ray results, Dr. Talens diagnosed Mr. Rosales with a left knee strain and requested his medical records from his previous providers to get a better understanding of his knee issues. Dr. Talens also prescribed Mr. Rosales Naprosyn in an effort to alleviate his left knee pain. In November 2009, Dr. Talens ordered an MRI of Mr. Rosales' left knee due to his continued complaints of pain. Results revealed no acute issues and only arthritic changes to his left knee. Dr. Talens next saw Mr. Rosales on May 14, 2010. Due to his continued complaints of left knee pain, Dr. Talens ordered an orthopedic consultation. Dr. Talens also continued Mr. Rosales' Ibuprofen and Naprosyn for pain management.

On June 29, 2010, Mr. Rosales presented to UAP Bone and Joint for an orthopedic consultation. The orthopedist recommended another MRI and a possible arthroscopy of Mr. Rosales' left knee. In response, Dr. Talens ordered another MRI of Mr. Rosales' left knee and requested an arthroscopy consultation.

On September 30, 2010, Mr. Rosales presented to Dr. Ertl at Wishard Hospital, now Eskanazi Hospital, for an arthroscopy consultation. Dr. Ertl noted that Mr. Rosales' symptoms were out of proportion to Dr. Ertl's physical findings and x-ray results. Dr. Ertl also decided not

to proceed with an arthroscopy as he believed it would not improve Mr. Rosales' symptoms, and that conservative management was appropriate.

Dr. Talens had no further involvement in Mr. Rosales' care. Dr. Talens never stopped or cancelled surgery for Mr. Rosales' knee. Instead, an outside specialist practicing at Wishard Hospital decided that surgery was not recommended at that time. Nor did Dr. Talens ever make medical decisions for Mr. Rosales based on financial motives. Instead, Dr. Talens used his training and experience in making medical decisions for Mr. Rosales. Dr. Talens attempted to address Mr. Rosales' concerns through diagnostic testing, pain medications, and consultations with outside experts.

**Dr. Leclerc** was a treating physician at Wabash Valley starting in January 2011 through December 2012. Dr. Leclerc first saw Mr. Rosales on February 15, 2011 for complaints of knee pain. Dr. Leclerc's physical exam revealed no evidence of knee instability, and a McMurray test, which is a rotational test of the knee to check for a possible meniscus tear, was negative. Despite the negative findings, Dr. Leclerc ordered x-rays of both knees. X-ray of Mr. Rosales' right knee was negative and left knee results confirmed nothing more than chronic changes.

Dr. Leclerc next evaluated Mr. Rosales on April 28, 2011, for knee pain. Mr. Rosales had been using a wheelchair, and Dr. Leclerc had him stand up and walk, which he was able to do under his own power. Dr. Leclerc explained to Mr. Rosales the importance of not relying on the wheelchair as his body and knees would continue to get weaker and more painful if he did not walk on his own. Dr. Leclerc offered Mr. Rosales crutches to help facilitate walking and to improve his muscle strength.

On May 22, 2011, Mark McAnally, RN, saw Mr. Rosales for knee pain. Nurse McAnally referred Mr. Rosales to see Dr. Leclerc, but Mr. Rosales did not want to see Dr. Leclerc again and wanted to wait to see another doctor. Mr. Rosales began seeing other providers at the facility for his knee issues.

Dr. Leclerc's last encounter with Mr. Rosales was on August 28, 2012, to evaluate whether he required the continued use of a wheelchair. Dr. Leclerc performed a full assessment of Mr. Rosales, including a neurological exam which confirmed an overall intact central and peripheral nervous system. An evaluation of Mr. Rosales' muscle bulk showed minimal atrophy but decreased strength. It was also Dr. Leclerc's opinion that during the exam, Mr. Rosales did not give his best effort as Dr. Leclerc could easily overcome some of the strongest muscles in the human body, and Mr. Rosales' lack of muscle atrophy would not correlate with such a result. Dr. Leclerc discontinued Mr. Rosales' wheelchair and ordered him a walker instead in an effort to build muscle strength and reduce pain. Dr. Leclerc also recommended progressive physical therapy for Mr. Rosales. Dr. Leclerc had no further involvement in Mr. Rosales' care.

**Dr. Joseph** was one of several treating physicians at Wabash Valley at various times relevant to Mr. Rosales' Complaint. As a physician at Wabash Valley, Dr. Joseph would see inmates as they were placed on her schedule by nursing staff. Dr. Joseph did not set or arrange the patient schedule.

Dr. Joseph first saw Mr. Rosales on or about November 8, 2011, for complaints of left knee pain. Dr. Joseph performed a physical assessment or Mr. Rosales' left knee and assessed osteoarthritis. In response, Dr. Joseph ordered a kenalog injection and physical therapy. On January 31, 2012, Dr. Joseph saw Mr. Rosales in response to complaints of left knee pain. Dr.

Joseph performed a McMurray test to check for a possible meniscus tear, which was negative. Dr. Joseph ordered an x-ray of the knee and Mobic for inflammation and pain management, and Dr. Joseph also instructed Mr. Rosales to continue with his physical therapy.

On May 1, 2012, Dr. Joseph again evaluated Mr. Rosales for left knee pain. Dr. Joseph instructed Mr. Rosales on an exercise program in an effort to increase leg strength and reduce pain. In June of 2012, Dr. Joseph scheduled additional physical therapy for Mr. Rosales. In August 2012, follow up x-rays of Mr. Rosales' knees were obtained showing only minimal arthritic changes to the right knee, and moderate arthritis due to trauma in the left knee, which was stable.

On October 17, 2012, after discussing Mr. Rosales' condition and care with Dr. Leclerc, Dr. Joseph agreed with Dr. Leclerc's recommendation to discontinue Mr. Rosales' wheelchair and replace it with a walker to rebuild his muscle strength and decrease atrophy and the pain in his knees. Dr. Joseph ordered physical therapy in an effort to regain strength in his legs and ease the transition from a wheelchair to a walker. On October 19, 2012, Dr. Joseph administered another steroid injection to Mr. Rosales' left knee in an effort to reduce his pain and inflammation. Dr. Joseph had no further involvement in the care of Mr. Rosales' left knee.

Mr. Rosales suffers from osteoarthritis in his left knee. Appropriate treatment of osteoarthritis includes conservative measures, including possibly anti-inflammatories, injections, and physical therapy, all of which the medical staff and Dr. Joseph provided to Mr. Rosales. Dr. Joseph addressed Mr. Rosales' concerns through diagnostic testing, physical exams, physical therapy, prescribing pain/anti-inflammatory medications including Mobic and Tegretol, and attempting to get Mr. Rosales out of his wheelchair in order to build muscle and reduce atrophy and pain.

**Nurse Kim Gray** was the Director of Nursing at Wabash Valley at times relevant to Rosales Complaint. In her role as Director of Nursing, Nurse Gray had little involvement in direct patient care. As a Nurse, Ms. Gray did not have the power or ability to order, cancel or provide surgery for an inmate, including Mr. Rosales. As a Nurse, Ms. Gray also did not have the power or ability to order the removal/discontinuation of Mr. Rosales' wheelchair, as this would have to be done by a physician. Instead, Nurse Gray informed Mr. Rosales that his wheelchair needed to be replaced with a walker per the order of the facility physician.

As a Nurse, it is Ms. Gray's responsibility to carry out physicians' orders, which is what she did by removing Mr. Rosales' wheelchair. Nurse Gray likely did not provide instruction to Mr. Rosales on how to use a walker as it is fairly intuitive and he had already been provided a walker and ordered physical therapy by the provider, which would have addressed his transition from a wheelchair to a walker. Nurse Gray did not have the ability to direct Mr. Rosales' medical care. Instead, Nurse Gray followed the orders as given by his physicians, which included the discontinuation of his wheelchair for a walker.

**Dr. William Bray** is a licensed physician in the State of Indiana and is Board Certified in Family Practice. Dr. Bray has reviewed Mr. Rosales' medical records from the Indiana Department of Correction, Eskenazi Health, and UAP Bone & Joint, and formulated opinions on those records, along with his medical education, training and experience. Based on his review of Mr. Rosales' medical records, it is Dr. Bray's opinion that the defendants (i.e. the medical providers within the Indiana Department of Correction) met the standard of care in their treatment of Mr. Rosales' left knee. Dr. Bray has formed this opinion to a reasonable degree of medical certainty based on the following:

1. Mr. Rosales suffers from arthritis in his left knee due to previous trauma. Medical providers met the accepted standard guidelines for treating arthritis by prescribing anti-inflammatories, occasional pain medications, obtaining x-rays and MRIs, providing physical therapy and steroid injections, and attempting to get Mr. Rosales out of his wheelchair and up walking to avoid further muscle atrophy.

2. Medical providers referred Mr. Rosales to an orthopedic surgeon who did not recommend surgery and instead suggested continuing the conservative treatment regimen that was already being implemented.

As for Dr. Alfred Talens, it is Dr. Bray's opinion that he complied with the standard of care in treating Mr. Rosales' arthritic left knee by prescribing anti-inflammatories and occasional pain medications, ordering x-rays and an MRI, and referring Mr. Rosales to an orthopedic surgeon.

As for Dr. Jacques Leclerc, it is Dr. Bray's opinion that he complied with the standard of care in treating Mr. Rosales' arthritic left knee by performing a McMurray test to rule out a possible meniscus tear, ordering x-rays and physical therapy, and by discontinuing the use of Mr. Rosales' wheelchair in an effort to increase his strength and decrease atrophy.

As for Dr. Lolit Joseph, it is Dr. Bray's opinion that she complied with the standard of care in treating Mr. Rosales' arthritic left knee by providing steroid injections, anti-inflammatories and occasional pain medications, ordering x-rays and physical therapy, and instructing Mr. Rosales on an exercise program.

It is also Dr. Bray's opinion that it was appropriate and within the standard of care for Nurse Kim Gray to remove Mr. Rosales' wheelchair as it is her job, as a nurse, to implement the

orders of the physician. Based on Dr. Bray's experience, the use of a walker is fairly intuitive and would typically not require much training, if any.

According to Dr. Bray, based on Mr. Rosales' symptoms, x-rays and MRI's, which have confirmed nothing more than arthritic changes to his left knee, it is not medically indicated to return Mr. Rosales to an orthopedic surgeon, or any other specialist. In fact, based on Mr. Rosales' symptoms and the lack in change of symptoms to his arthritic left knee during his incarceration, Dr. Bray would have performed the same testing and recommended the same conservative regimen to Mr. Rosales if Dr. Bray saw Mr. Rosales in his own practice.

## III.
## Discussion

Mr. Rosales asserts Eighth Amendment medical care claims against the defendants. At all times relevant to Mr. Rosales' claim, he was a convicted offender. Accordingly, his treatment and the conditions of his confinement are evaluated under standards established by the Eighth Amendment's proscription against the imposition of cruel and unusual punishment. *See Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.").

Pursuant to the Eighth Amendment, prison officials have a duty to provide humane conditions of confinement, meaning, they must take reasonable measures to guarantee the safety of the inmates and ensure that they receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To prevail on an Eighth Amendment deliberate indifference medical claim, a plaintiff must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendant knew about the plaintiff's condition

10

and the substantial risk of harm it posed, but disregarded that risk. *Id.* at 837; *Pittman ex rel. Hamilton v. County of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014).

"[C]onduct is 'deliberately indifferent' when the official has acted in an intentional or criminally reckless manner, *i.e.*, "the defendant must have known that the plaintiff 'was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so.'" *Board v. Freeman*, 394 F.3d 469, 478 (7th Cir. 2005) (*quoting Armstrong v. Squadrito*, 152 F.3d 564, 577 (7th Cir. 1998)). "To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). *See Plummer v. Wexford Health Sources, Inc.*, 609 Fed. Appx. 861, 2015 WL 4461297, *2 (7th Cir. 2015) (holding that defendant doctors were not deliberately indifferent because there was "no evidence suggesting that the defendants failed to exercise medical judgment or responded inappropriately to [the plaintiff's] ailments"). In addition, the Seventh Circuit has explained that "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.*

For purposes of summary judgment, the parties do not dispute that Mr. Rosales' knee condition constitutes a serious medical condition. Instead, they disagree as to whether the defendants were deliberately indifferent to Mr. Rosales's knee problems. The defendants argue

11

that the designated evidence confirms that Mr. Rosales was provided with appropriate care, including multiple evaluations, diagnostic testing, physical therapy, injections, pain medications, and referrals to outside specialists. The facts related each of the defendants is discussed below.

### A. Dr. Talens

Mr. Rosales claim against Dr. Talens is that the doctor did not follow through with sending Mr. Rosales to Wishard Hospital and that Dr. Talens stopped Mr. Rosales's knee surgery treatment because the knee replacement surgery was too expensive. To the contrary, the record establishes that Dr. Talens did in fact send Mr. Rosales to Wishard Hospital on September 30, 2010, and that it was the outside specialist, an orthopedic surgeon, who decided that surgery was not recommended. The outside specialist recommended continuing conservative treatment measures, which was done. The fact that Mr. Rosales is displeased with the decision to not move forward with surgery, which was made by an outside specialist, does not establish deliberate indifference on the part of Dr. Talens. The record reflects that Dr. Talens used his medical judgment in caring for Mr. Rosales and that Dr. Talens was not deliberately indifferent to Mr. Rosales serious medical needs.

### B. Dr. LeClerc

Similarly, Mr. Rosales alleges that Dr. LeClerc was deliberately indifferent by denying surgery for Mr. Rosales' left knee. Again, Mr. Rosales is mistaken, it was an outside orthopedic surgeon who determined that surgery was not recommended because surgery likely would not have improved Mr. Rosales' symptoms. Under these circumstances, Dr. LeClerc cannot be found deliberately indifferent because surgery was not performed.

Despite Mr. Rosales' contention that Dr. Leclerc was deliberately indifferent when he replaced Mr. Rosales' wheelchair with a walker, this was done in an effort to improve Mr. Rosales' quality of life and reduce pain. Dr. Leclerc witnessed Mr. Rosales get out of his wheelchair and walk under his own power during Dr. Leclerc's April 28, 2011, evaluation of Mr. Rosales. Dr. Leclerc knew that the longer Mr. Rosales remained in his wheelchair, the more atrophy and pain Mr. Rosales would experience in his legs and knees. In hopes of reversing this trend, Dr. Leclerc discontinued Mr. Rosales' wheelchair in an effort to get him up and walking and recommended progressive physical therapy to assist with the transition and increase strength.

Once again, the fact that Mr. Rosales disagrees with Dr. Leclerc's course of treatment, including discontinuing the use of a wheelchair for a walker, does not establish deliberate indifference. *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006). Dr. Leclerc made decisions based on his medical judgment and what he thought was in Rosales' best interest. This view was corroborated by Dr. Bray who opined that Dr. Leclerc's medical decisions were appropriate and conformed to the standard of care.

### C. Dr. Joseph

Mr. Rosales contends that Dr. Joseph "prohibited Plaintiff from obtaining necessary treatment for his injured left knee" and failed to provide "appropriate and needed medical care for his left knee condition." Plaintiff's Amended Complaint, para. 3. The record establishes, however, that Dr. Joseph performed physical assessments of Mr. Rosales' left knee, administered multiple steroid injections for his left knee, provided pain medications and ordered physical therapy, all in an effort to address Mr. Rosales' complaints of left knee pain. In no way do Dr. Joseph's actions suggest that she prohibited or failed to provide Mr. Rosales with appropriate care for his knee.

13

Dr. Bray confirmed that Dr. Joseph's actions were appropriate and within the standard of care for Mr. Rosales' knee condition. Mr. Rosales cannot demand specific care, which he believes should have been surgery for his knee (despite the opinion of an outside orthopedic specialist to the contrary). Dr. Joseph used her medical training and judgment to make decisions that she felt were in the best interest of Mr. Rosales. Accordingly, Dr. Joseph is entitled to summary judgment on the claims alleged against her.

### D.  Nurse Gray

Nurse Gray appropriately implemented the orders of Mr. Rosales' physicians by discontinuing the use of his wheelchair. Mr. Rosales was already in possession of a walker and had already been ordered physical therapy, so Nurse Gray felt that additional instruction on how to use a walker was unnecessary. Mr. Rosales contends that Nurse Gray intentionally deprived Mr. Rosales of "needed surgery for his left knee." Plaintiff's Amended Complaint, para. 5. This contention is inaccurate as the designated evidence establishes that (1) as a nurse, Nurse Gray did not have the power or ability to order or deny surgery for a patient such as Mr. Rosales, and that (2) it was an outside specialist from Eskanazi Hospital who decided that surgery was not indicated for Mr. Rosales.

Dr. Bray has opined that Nurse Gray complied with the standard of care by following Mr. Rosales' physicians' orders. Therefore, her actions cannot constitute deliberate indifference to Mr. Rosales' medical needs and she is entitled to summary judgment in her favor.

### E.  Corizon

The amended complaint alleges that defendant Corizon, Inc. is liable because it, by and through the actions of its agent physicians and healthcare providers, intentionally interfered with

Mr. Rosales receiving medical care once prescribed, and failed to provide Mr. Rosales appropriate and needed medical care (including surgery) needed on his left knee.

Corizon argues that it is entitled to summary judgment because Governmental entities may not be held liable for the unconstitutional acts of their employees unless those acts were carried out pursuant to an official custom or policy. *Grieveson v. Anderson*, 538 F.3d 771 (7th Cir. 2008). Because Corizon acts under color of state law by contracting to perform a government function, i.e. providing medical care to correctional facilities, Corizon is treated as a government entity for purposes of Section 1983 claims. *See Jackson v. Illinois Medi-Car, Inc.*, 300 F.3d 760, 766 fn.6 (7th Cir. 2002). Therefore, to state a cognizable deliberate indifference claim against Corizon, Mr. Rosales must establish that he suffered a constitutional deprivation as the result of an express policy or custom of Corizon. Mr. Rosales must show that Corizon has: (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a practice that is so wide-spread that, although not authorized by written or express policy, is so permanent and well settled as to constitute a custom or usage with the force of law, or (3) an allegation that the constitutional injury was caused by a person with final policy making authority. *Estate of Moreland v. Dieter*, 395 F.3d 747, 758-759 (7th Cir. 2004).

Mr. Rosales cannot meet his burden as to this claim. As discussed in detail above, Corizon's healthcare providers did not interfere with medical treatment for Mr. Rosales or determine that Mr. Rosales did not require surgery. This was determined by an outside specialist. In addition, Corizon cannot be liable for the actions of its employees when those actions were within the standard of care. In other words, Mr. Rosales cannot show that there was a systemic problem with Corizon's healthcare system which violated his Eighth Amendment rights because the undisputed facts

confirm that Mr. Rosales was provided constitutionally adequate medical care for his left knee during the time he was under the defendant medical providers' care. Under these circumstances, Corizon is entitled to summary judgment in its favor.

**F. Continuing Care**

The issue of Mr. Rosales' continuing care provided by non-parties is raised in his response to the motion for summary judgment and is outside the scope of this civil action. The defendants last interacted with Mr. Rosales in 2012. See dkt. 95 at p. 2. Mr. Rosales' arguments pertaining to care he received in 2015 from another medical provider are not relevant to a determination of whether the defendants in this action acted with deliberate indifference towards his condition from 2009 – 2012.

In reviewing the record in this case, the Court notes that the defendants rely heavily on the fact that they consulted a specialist and followed his instructions. Janos P. Ertl, M.D., an orthopedic surgeon, saw plaintiff Oscar Rosales on September 30, 2010, for an orthopedic evaluation. This evaluation resulted in the following plan:



> PLAN: Conservative management. It is doubtful that an arthroscopy at this time will improve the patient's symptoms; however, they may temporize them. The patient will require a total knee arthroplasty at some point in time; however, he is significantly young at 41 years old. The patient has findings out of proportion to physical examination as well as x-ray examination with the inability to bear weight or the refusal to bear weight for reasons unobtainable, however, possibly related to incarceration.
>
> The patient may benefit from a spinal consultation for evaluation of his degenerative disk disease.
>
> Should the patient have persistent knee symptoms, consideration should be given towards referral for total joint arthroplasty, not sports trauma clinic.

Dkt. 86-1 at p. 18-19. As discussed above, the Court finds that the actions taken by the defendants were at least reasonable, and certainly not deliberately indifferent. Continuing with conservative treatment at least through 2012 was appropriate and the evidence including the opinion of non-

party Dr. Bray supports this finding. Dr. Bray, a medical doctor testified that based on the medical records including x-rays and MRI's which show arthritic changes to Rosales's left knee, that it was not medically indicated to return Mr. Rosales to an orthopedic surgeon, or any other specialist. Dkt. 86-5 at p. 3. And if the defendants met the standard of care—that is, they were not even negligent in pursuing this course of treatment—this alone demonstrates that the defendants were not deliberately indifferent to Mr. Rosales' knee condition. *See King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012) ("Negligence—even gross negligence—is insufficient to [show deliberate indifference].").

In addition to conservative management, however, Dr. Ertl stated that "**[t]he patient will require a total knee arthroplasty at some point** in time" and "[s]hould the patient have persistent knee symptoms, consideration should be given towards referral for total joint arthroplasty." More than five years have passed since Dr. Ertl's evaluation and Mr. Rosales reports that he continues to have knee problems. In addition, the Indiana Department of Correction's website reflects that Mr. Rosales is serving a 30 year sentence imposed on April 9, 2009, and that his earliest possible release date is January 9, 2034.

Given these circumstances, the Court anticipates that Mr. Rosales' present medical providers will rely on their own medical judgment when considering whether to refer Mr. Rosales for total joint arthroplasty.  However, none are defendants here.

### IV. Conclusion

The record in this case establishes that the defendants' medical treatment of Mr. Rosales' knee between 2009 and 2012 was appropriate and within the standard of care. It was the outside orthopedic surgeon who decided not to proceed with an arthroscopy as he believed it would not

17

improve Mr. Rosales' symptoms, and who concluded that conservative management was appropriate. Mr. Rosales has failed to show that the defendants were deliberately indifferent to his serious medical needs and the defendants are entitled to judgment as a matter of law. For these reasons the motion for summary judgment [dkt. 84] is **granted.**

Judgment consistent with this Entry shall now issue.

**IT IS SO ORDERED.**

Date: __January 4, 2016__

_____
Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

All Electronically Registered Counsel

OSCAR ROSALES
DOC # 194882
Wabash Valley Correctional Facility
Electronic Service Participant -- Court Only